# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### January 7, 2014 Session

## STATE OF TENNESSEE v. JOSEPH SAMUEL KYLE

**Appeal from the Circuit Court for Benton County**
**No. 12CR81     C. Creed McGinley, Judge**

---

**No. W2013-01013-CCA-R3-CD  -  Filed April 17, 2014**

---

The defendant, Joseph Samuel Kyle, was convicted by a Benton County Circuit Court jury of aggravated criminal trespass, a Class A misdemeanor, and was sentenced to eleven months and twenty-nine days, suspended to probation after serving thirty days in jail. On appeal, he argues: (1) interrelated issues that the trial court erred in overruling his motions for judgment of acquittal and new trial and that the evidence is insufficient to sustain his conviction; and (2) the trial court erred in allowing hearsay testimony into evidence over his objection. After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR. and ROGER A. PAGE, JJ., joined.

J. Neil Thompson, Huntingdon, Tennessee, for the appellant, Joseph Samuel Kyle.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Senior Counsel; Hansel J. McCadams, District Attorney General; and James E. Williams, III, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The defendant was indicted for aggravated criminal trespass and resisting arrest. At trial, Catherine Shelton, the victim, testified that on March 6, 2012, she was at her home in Big Sandy, Tennessee, getting ready for an appointment. She let her dogs out "to do their business" and went to her bedroom to dress. Soon after, the dogs ran into her bedroom, which concerned her because she did not know how they could have gotten into the house.

She walked up the hallway and saw the defendant "standing inside of . . . both of [her] doors." She explained that she had a glass storm door, which opened out onto the front porch, and a wooden door, which opened into the house. She said that the defendant "was across the threshold far enough inside of [her] house where [she] could not shut the door." The defendant was holding the storm door with his hand, and the victim was "positive both [of the defendant's] feet were inside . . . over the threshold." The victim could not close either door because the defendant "was standing there."

The victim testified that she was not expecting the defendant and was shocked and very scared to see him standing there, although she tried to hide her alarm. She could tell that the defendant was very intoxicated. The defendant said to her, "Do you know who I am?" and she responded, "Yes, sir. You're Joe. And you have to leave right now because I got an appointment." The defendant initially protested, but she told him again that he had to leave and "walked closer to him to get him to back away so [she] could shut [the] door." The victim said, "[F]inally he did step out across the threshold and was outside," and she shut and locked the doors. She was "scared to death then" and "so shook up [she] didn't know what to do at that point." She could not find the phone number for the police, so she called her neighbors, the Lamberts, for help. In the meantime, the victim's daughter called her and, upon learning what happened, called 911.

The victim testified that she recognized the defendant because he had repaired computers for her late husband. In addition, the defendant and his wife owned a restaurant, where the victim and her late husband dined "once or twice a month." The victim's husband passed away in 2010, and the defendant was an honorary pallbearer at his funeral. A few days after the funeral, the defendant called the victim around midnight. She "couldn't understand a word he was saying" and thought that he was intoxicated. She told the defendant not to call back again or at least to be sober if he needed to speak to her. She did not hear from the defendant again until he showed up at her house, which was almost two years later.

Janet Lambert, the victim's neighbor, testified that the victim called her for help. The victim was "totally hysterical" as she described finding the defendant standing in her foyer area, "inside the two doors . . . right in the threshold, over the threshold area." Mrs. Lambert also talked to the victim's daughter and assured her that Mr. Lambert was going to the victim's house to check on her. Ricky Alan Lambert testified that he went to the victim's house "to protect her or help her, whatever [he] could do." When he arrived, the victim was "[h]ysterical" and "scared to death" as she described finding an intruder inside her home. The victim settled down some after the police arrived and took their statements.

Mrs. Lambert testified that, while she was on the phone with the victim, she looked out the window and saw a "light-colored, tannish, grayish" small pickup truck coming from the direction of the victim's house. The truck turned around in the Lamberts' driveway and went back toward the victim's house. Mr. Lambert also saw the truck turn around in the driveway.

Sergeant Alan Bolan with the Benton County Sheriff's Department testified that he responded to a call about an intruder in the victim's home. He talked to the victim, and she was "very nervous, scared, upset." Once the victim settled down, she told Sergeant Bolan what had happened. She told him that she had been in a bedroom in the back of the house getting dressed when one of her dogs came into the room, which concerned her because she did not know how the dog had gotten into the house. She went to the front of the house to investigate and saw the defendant "standing inside her house" in the area of the front door. She asked the defendant to leave and eventually "almost pushed him out of the house." Based on the victim's statement, Sergeant Bolan "pressed charges" against the defendant.

Lieutenant Bryant Allen with the Benton County Sheriff's Department testified that he heard the radio dispatch call about the intruder at the victim's house and a description of the truck the Lamberts saw in the area. Shortly thereafter, he saw a truck matching the description coming from the opposite direction that he was traveling on Highway 69A. Lieutenant Allen radioed Lieutenant Jason Lowery, who was also in the area, and turned around to follow the truck. Lieutenant Lowery saw the tan Ford Ranger truck, with Bob Pace driving and the defendant in the passenger seat. By the time Lieutenant Allen turned around and caught up to the truck, Lieutenant Lowery had "initiated blue lights" to stop the vehicle. Lieutenant Allen "pulled right in behind the vehicle," and Lieutenant Lowery pulled in behind both vehicles.

Lieutenant Allen testified that he recognized the driver of the truck as Bob Pace and the passenger as the defendant. The defendant was very loud and belligerent, yelling over and over at Lieutenant Allen to "excuse" himself. Lieutenant Lowery smelled alcohol on the defendant, and Lieutenant Allen smelled alcohol on both the defendant and Pace. After learning that the victim wanted to press charges against the defendant, the officers took the defendant into custody with some difficultly.

The defendant presented the testimony of three witnesses at trial. Chad Edward Kennedy, a funeral director at Ridgeway Funeral Home, testified that the defendant was an honorary pallbearer and gave a eulogy at the funeral for the victim's late husband. Kennedy "[v]aguely" remembered the defendant bringing a flag for the service.

Robert Edwin Pace testified that the defendant helped him install a security system at his house on March 6, 2012. Later that afternoon, he drove the defendant to the victim's house. Pace parked in the driveway and went to the edge of the garage to urinate, while the defendant went to the front of the house. Pace heard no yelling or "door slams" during the time the defendant was away. The defendant returned to the truck after only a short time, and they left. Pace headed the wrong way and had to turn around in a neighbor's driveway.

Pace testified that he pulled over when he saw Lieutenant Allen's blue lights. Pace stated that the defendant was standing calmly beside the car when someone yelled, "You're resisting arrest, you're resisting arrest." Pace said that the officers "attacked" the defendant and "threw" him into the patrol car.

Debbie Dyer Kyle, the defendant's wife, testified that the defendant and the victim's late husband had a relationship akin to that of a father and son. They talked on the phone and emailed each other three or four times a day. Mrs. Kyle said that she and defendant went to the victim's and her husband's home on at least twenty occasions. The victim and her husband ate in the Kyles' restaurant "on several occasions" and were never charged for their food because "they were like friends." Mrs. Kyle testified that she had not seen the victim since the victim's husband died.

Following the conclusion of the proof, the jury convicted the defendant of aggravated criminal trespass but found him not guilty of resisting arrest.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant argues that the trial court erred in overruling his motions for judgment of acquittal and new trial and that the evidence is insufficient to sustain his conviction. Although worded differently, each of these issues is essentially a challenge to the sufficiency of the convicting evidence.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600,

-4-

604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

As relevant here, a person commits aggravated criminal trespass by entering or remaining on property when "(1) [t]he person knows the person does not have the property owner's effective consent to do so; and (2) [t]he person intends, knows, or is reckless about whether such person's presence will cause fear for the safety of another[.]" Tenn. Code Ann. § 39-14-406(a)(1), (2). The term "enter" means intrusion of the entire body. Id. § 39-14-406(b). Aggravated criminal trespass is a Class A misdemeanor when it is committed in a habitation. Id. § 39-14-406(c).

In the light most favorable to the State, the evidence shows that the defendant entered the victim's house without permission, causing the victim to fear for her safety. The defendant stepped over the threshold of the victim's front door entrance with both feet, while holding the glass storm door open with his hand. The defendant was "across the threshold far enough inside of [the victim's] house" that the victim could not close either door because the defendant was blocking the entry way.

The defendant argues that "the definition of 'entire body' should be the exact opposite of the definition of 'any part of the body' as it is used in the elements of Burglary under

T.C.A. § 39-14-402." Thus, he asserts that "if a defendant's entire body intrudes except a hand, for instance, then the element of 'entire body' [for aggravated criminal trespass] is not satisfied." He, therefore, argues that because his hand or arm was holding the outer glass door open, his "entire body" was not inside the victim's house and that he cannot be guilty of aggravated criminal trespass.

Although the defendant's argument is quite clever, this court has previously considered the meaning of the term "enter" for purposes of the criminal trespass statute, State v. Hollingsworth, 944 S.W.2d 625 (Tenn. Crim. App. 1996), and we determine that the reasoning is applicable in this case and consistent with the intent of the aggravated criminal trespass statute. In Hollingsworth, the four defendants were charged with criminal trespass after they chained themselves to the gate of an abortion clinic. Id. at 627. They were convicted, and this court affirmed the convictions, ruling:

> The appellants entered the premises of the clinic. Each appellant had his or her torso within the area owned by the clinic. While the appellants' legs extended beyond the property line, their legs were within the driveway leading from the street to the clinic's parking lot. It is an elementary rule of law that the owner of property has an easement of access between the property and an abutting street. This Court holds that when a person's body is within the owner's easement, denying the owner ingress and egress, there has been an "intrusion of the entire body" within the meaning of the statute. Here, the appellants' entire bodies were blocking the driveway leading into the main parking lot. Neither the owners of the property nor the patients seeking assistance at the clinic could enter or leave the premises through the main entrance to the front parking lot.

Id. at 628.

In this case, the defendant's legs and torso were inside the victim's home. His body blocked the entry way so that the victim could not close the doors to prevent the defendant's further entry or allow her to exit through the front door. The defendant's body was within the victim's easement, denying her ingress and egress. As such, there was an intrusion of the entire body within the meaning of the statute; therefore, we conclude that the evidence is sufficient to support the defendant's conviction for aggravated criminal trespass.

## II. Hearsay

The defendant also argues that the trial court erred in allowing hearsay testimony from Sergeant Bolan over his objection. The record shows that, during its direct examination of

Sergeant Bolan, the State asked Sergeant Bolan what the victim told him when he arrived at the scene. Defense counsel immediately objected based on hearsay, and the court overruled the objection without hearing arguments from the parties or explaining the basis for its ruling. Sergeant Bolan then testified about the victim's statement to him regarding the defendant's entry into her home, repeating her description of the sequence of events. The State concedes that Sergeant Bolan's testimony about the victim's statement was hearsay, but argues that its admission was harmless because the victim and two other witnesses testified about the events that Sergeant Bolan described.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). As a general rule, hearsay is not admissible at trial unless it falls under one of the exceptions to the rule against hearsay. Tenn. R. Evid. 802. "The determination of whether a statement is hearsay and whether it is admissible through an exception to the hearsay rule is left to the sound discretion of the trial court." State v. Thomas, 158 S.W.3d 361, 400 (Tenn. 2005) (quoting State v. Stout, 46 S.W.3d 689, 697 (Tenn. 2001)). Accordingly, we will not reverse the trial court's ruling on this issue absent a clear showing of an abuse of discretion. Id.

We initially note that the statement possibly could have been admitted as an excited utterance, and it appears that the State attempted to lay a foundation for this exception by questioning Sergeant Bolan about the victim's demeanor when he arrived at the scene. See Tenn. R. Evid. 803(2). However, the State was precluded from presenting this exception as a basis for admission of the testimony, and the trial court did not specifically rule that the victim's statement to Sergeant Bolan was an excited utterance.

However, even if admission of the hearsay testimony of Sergeant Bolan was in error, any error was harmless because other witnesses, whose testimony was properly admitted, testified about the events that Sergeant Bolan described. See Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."). The victim testified and gave repeated descriptions of the defendant's entry into her home. Janet Lambert, whose testimony was admitted as an excited utterance, testified about the victim's description of the incident to her. Ricky Lambert, whose testimony garnered no objection, testified that the victim told him that she found an intruder just inside the front door of her home. In light of this evidence and the entire record, the defendant cannot show that the erroneous admission of hearsay "more probably than not affected the outcome of the trial." See State v. Rodriguez, 254 S.W.3d 361, 372 (Tenn. 2008) (stating that when assessing the impact of a non-constitutional error, the reviewing court may appropriately consider the

properly admitted evidence of a defendant's guilt).

## <u>CONCLUSION</u>

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE